IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

**AMANDA R., on behalf of**
**G.R.III,**
  **Plaintiff,**

v.                Case No. 3:10-cv-01418

**MICHAEL J. ASTRUE,**
**Commissioner of the Social**
**Security Administration,**

  **Defendant.**

### MEMORANDUM OPINION

  This is an action seeking review of the final decision of the Commissioner of Social Security denying the Claimant's application for children's Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.  The case is presently before the Court on the parties' Motions for Judgment on the Pleadings as articulated in their supporting briefs. (Docket Nos. 11 and 14). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 12 and 13).

  The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

**I.**  **PROCEDURAL HISTORY**

  Plaintiff, G.R.III (hereinafter referred to as "Claimant"), through his mother Amanda R., filed an application for children's SSI benefits on February 11, 2009, alleging disability since his birth on July 28, 2000 due to "binocular fusional

dysfunction,[1] mental impairment, and seizure disorder." (Tr. at 77-79, 106). The Social Security Administration ("SSA") denied the application initially and upon reconsideration. (Tr. at 11). Claimant timely requested a hearing, which took place on April 7, 2010 before the Honorable Marc Mates, Administrative Law Judge ("ALJ"). (Tr. at 11-23). By decision dated May 26, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 8-27). The ALJ's decision became the final decision of the Commissioner on October 25, 2010, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3). On December 28, 2010, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

## II. CLAIMANT'S BACKGROUND

Claimant was born in July 2000 at 37 weeks gestation and was immediately hospitalized for one month with a subarachnoid hemorrhage that resulted in seizures. (Tr. at 278, 283). He was treated with Phenobarbital for seven months until his seizures stopped. (*Id.*). At three years of age, Claimant was identified by the local school system as a child who could benefit from preschool special needs services. (Tr. at 189). He attended two years of preschool and then enrolled in kindergarten. At the conclusion of kindergarten, Claimant's parents and teachers decided that he should repeat the grade. At age six, the school arranged for Claimant to take the Wechsler Individual Achievement Test (WIAT-II) to assess his levels of performance in reading, writing, and mathematics. (Tr. at 176). Claimant scored in the average range in reading and mathematics and in the low average range in

---

[1] A visual dysfunction affecting an individual's ability to incorporate images from both eyes simultaneously. *The American Heritage® Science Dictionary*, Copyright © 2005 by Houghton Mifflin Company.

writing. (*Id.*). Claimant also took the Wechsler Intelligence Scale for Children and scored a 79 in verbal; an 82 in perceptual reasoning; a 94 in working memory; a 70 in processing speed; and a 77 full scale IQ. (Tr. at 167). As part of the testing, Claimant received a psychological evaluation. (Tr. at 166). During the examination, the psychologist noted that Claimant was easily distracted. As a result, the psychologist suggested that Claimant be evaluated to confirm or rule out the presence of attention deficit hyperactivity disorder ("ADHD"). The psychologist also recommended that Claimant's information be presented to the school's eligibility committee to determine if Claimant qualified for special education services under an Individualized Education Plan ("IEP").[2] The committee subsequently considered Claimant's need for special education services and determined that he did not meet the qualifying criteria. (Tr. at 205).

In May 2008, Claimant's parents became concerned that Claimant was experiencing a recurrence of seizure activity because he had staring spells and complained of severe headaches. (Tr. at 205). A EEG was performed and was interpreted as normal. (Tr. at 279). An MRI of Claimant's brain revealed some old abnormalities, but these were not thought to be the cause of Claimant's headaches. In December 2008, Claimant's eyesight was tested and he was found to have binocular dysfunction; fusional vergence dysfunction; oculomotor dysfunction; and visual perceptual disturbances. (Tr. at 269). Essentially, Claimant's eyes did not move smoothly or accurately track, align, and focus. (Tr. at 267-271). His visual acuity, however, was acceptable, testing at 20/20 in his left eye both near and at a

---

[2] An IEP is a written plan prepared by school personnel that sets out the unique academic needs and goals of a particular child with a disability and outlines the resources required to properly educate that child. *See Policy 2419,* West Virginia Department of Education.

distance and 20/20 near and 20/25 at a distance in his right eye. (*Id.*). The optometrist performing the examination prescribed glasses and recommended 48-56 hours of office therapy. He opined that with therapy, Claimant's prognosis for correcting his visual problems was good. (*Id.*). Unfortunately, Claimant did not receive the proposed therapy.

In January 2009, Claimant's need for special education services was again assessed by his school's IEP committee. (Tr. at 154-164). The committee determined that while Claimant did not meet the criteria necessary to qualify for special education services, he would benefit from classroom modifications; such as, adjusted grading, extended testing time, and oral testing. (*Id.*). At the time of the administrative hearing in April 2010, Claimant was nine years old and attending the third grade. He remained in a general education environment 100% of the time with continued modifications. Claimant lived with his mother, father, and three siblings. He had no impairments in his physical abilities (i.e. walk, run, lift, climb) or socially, but had been diagnosed with anxiety disorder and ADHD. (Tr. at 33, 281).

### III. THE SEQUENTIAL PROCESS AND THE ALJ'S DECISION

A child is disabled under the Social Security Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). An ALJ determines whether a child is disabled by performing a three-step sequential evaluation. 20 U.S.C. § 416.924. At the first step, the ALJ determines whether the child is engaged in substantial gainful activity. *Id.* If the child is, he or she is found not disabled. *Id.* If the child is not, the second

inquiry is whether the child has a medically determinable impairment that is severe. *Id.* An impairment which is only a "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations" is **not** severe. *Id.* If a severe impairment is present, the third and final inquiry is whether the impairment meets, medically equals, or functionally equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listings"). *Id.* §§ 416.924, 416.926a. The Listings, in relevant part, describe impairments that are presumed by the SSA to cause severe and marked functional limitations in children and, thus, are disabling. Each listed impairment includes specific severity criteria. If the child's impairment meets, medically equals, or functionally equals the severity criteria of a listing and also meets the duration requirement, the child is found disabled and awarded benefits. *Id.* Otherwise, the child is not disabled under the Social Security Act.

To medically meet a listing, the child's impairment must satisfy all of the severity criteria of the listing. 20 C.F.R. §§ 416.925. To be medically equivalent to a listing, the child's impairment must consist of findings that are at least of equal medical significance to the required criteria. 20 C.F.R. §§ 416.925, 416.926. "To functionally equal the listings, an impairment(s) must be of listing-level severity; that is, it must result in 'marked' limitations in two domains[3] of functioning or an

---

[3] Domains are the "broad areas of functioning intended to capture all of what a child can or cannot do." In his or her evaluation, the ALJ uses the six domains set forth in *Social Security Ruling ("SSR")* 09-1P, which are the following:

    (1)  Acquiring and using information;
    (2)  Attending and completing tasks;
    (3)  Interacting and relating to others;
    (4)  Moving about and manipulating objects;
    (5)  Self-care; and
    (6)  Health and physical well-being.

'extreme' limitation in one domain." *Id.* § 416.926a(b)(1). "Functioning" includes everything a child does throughout the day; at home, at school, and in the community. *SSR* 09-1P. A "marked" limitation is "more than moderate," but "less than extreme" and correlates to scores on standardized tests that are at least two, but less than three, standard deviations below the mean. *Id.* § 416.926a(e)(2)(i). An "extreme" limitation is the most severe and correlates to scores on a standardized test that are at least three standard deviations below the mean. *Id.* § 416.926a(e)(3)(i).

When deciding whether a child's impairments functionally equal the Listings, the ALJ begins by reviewing the evidence and identifying limitations in the child's activities. The ALJ then ascertains which of the six domains of functioning are implicated and rates the severity of the limitations in each affected domain. *SSR* 09-1P. "This technique for determining functional equivalence accounts for all of the effects of a child's impairments singly and in combination—the interactive and cumulative effects of the impairments—because it starts with a consideration of actual functioning in all settings." *Id.*

In this particular case, the ALJ determined that Claimant satisfied the first inquiry, because he had not engaged in substantial gainful activity. (Tr. at 14, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of: binocular fusional dysfunction; seizure disorder; borderline intellectual function; and anxiety disorder. (Tr. at 14, Finding No. 3). At the third and final inquiry, the ALJ concluded that Claimant's impairments did not meet and or medically equal the level of severity of any impairment contained in the Listings. (Tr. at 14, Finding No. 4). Consequently, the ALJ evaluated Claimant's

impairments to determine if they were functionally equivalent to a listed impairment, analyzing all of the relevant evidence under the six domains of functioning. (Tr. at 14-23). The ALJ found that Claimant had a less than marked limitation in acquiring and using information; a marked limitation in attending and completing tasks; no limitation in interacting and relating to others; no limitation in moving about and manipulating objects; less than marked limitation in the ability to care for himself; and no limitation in health and physical well-being. (*Id.*). As a result, the ALJ concluded that Claimant did not have an impairment or combination of impairments that functionally equaled the Listings and, hence, was not under a disability as defined in the Social Security Act. (Tr. at 14-23, Finding Nos. 5 and 6).

## IV. CLAIMANT'S CHALLENGES TO THE FINAL DECISION

Claimant asserts that the Commissioner's decision is not supported by substantial evidence for two reasons. First, the ALJ improperly evaluated Claimant's ability to acquire and use information, ignoring evidence that supported a severity rating of "marked" limitation in that functional domain. (Docket No. 11 at 11-12). Second, Claimant alleges that the Appeals Council failed to consider supplemental evidence that was properly provided with Claimant's request for review. (Id. at 12-13). According to Claimant, the additional evidence further substantiateS the severity of his academic, cognitive, and behavioral impairments.

In response, the Commissioner contends that substantial evidence supports the ALJ's determination that Claimant had a less than marked restriction in his ability to acquire and use information. Pointing to Claimant's performance in school, the Commissioner argues that Claimant received passing grades without the need for special education classes. (Docket No. 14 at 14). Moreover, Claimant was

consistently noted to be alert, oriented, attentive, and cooperative when examined by treating and consultative experts. In regard to the supplemental evidence, the Commissioner suggests that it was neither new nor material and simply reconfirmed information already considered by the ALJ in reaching his decision. Accordingly, the supplemental evidence does not provide a sufficient basis for remand or reversal.

## V.     SCOPE OF REVIEW

The sole issue before this court is whether the final decision of the Commissioner denying the application for benefits is supported by substantial evidence. In *Blalock v. Richardson,* 483 F.2d 773 (4th Cir. 1972), the Fourth Circuit Court of Appeals defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Cellebreze*, 368 F.2d 640, 642 (4th Cir. 1966)). The Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The decision before this Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d585, 589 (4th Cir. 2001). If substantial evidence

exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision." *Blalock v. Richardson,* 483 F.2d at 775.

## VI. DISCUSSION

### A. The ALJ's Finding in the Domain of Acquiring and Using Information

As stated *supra,* in order to determine if a child's impairment is severe enough to functionally equal a listed impairment, the ALJ must assess the effects of the impairment by rating the degree to which it limits the child's functioning in six domains. If the child has "marked" limitations in two of the six domains, or "extreme" limitations in one of them, the child's impairment is functionally equivalent to the Listings. 20 C.F.R. § 416.926a(d). To accomplish this assessment, the ALJ must first obtain accepted medical source verification that the child has at least one medically determinable impairment. Once the existence of an impairment is verified, the ALJ gathers evidence that establishes the child's level of functioning on a longitudinal basis. The ALJ may consider accepted medical source, other medical source, and non-medical source evidence to determine how the impairment "affects the child's ability to function compared to children of the same age who do not have impairments." *SSR* 09-2P. Examples of evidence that may be considered by the ALJ include documentation from early intervention and school programs; comprehensive evaluations; IEP's and family service plans; records prepared by pediatricians, teachers, daycare workers, psychiatric social workers, nurse practitioners, speech pathologists; and statements from others, such as parents, siblings, friends, neighbors, and clergy.  Because these diverse sources likely use varied standards of comparison when commenting on the child's functioning, the ALJ must appreciate the standard used by the source and be familiar with the group

to whom the child is being compared. If there are material inconsistencies in the evidence, the ALJ should resolve them, or should obtain clarification or additional evidence as needed to reconcile them.

Here, the ALJ assessed Claimant's functioning in the six domains and concluded that Claimant had no limitations in three of them (interacting and relating to others; moving about and manipulating objects; and health and physical well-being); had less than marked limitations in two of them (acquiring and using information and caring for himself); and had a marked limitation in one of them (attending and completing tasks). (Tr. at 16-23). Claimant does not challenge the accuracy of five of the domain ratings, but does contest the ALJ's finding of "less than marked limitation" in the domain of acquiring and using information. (Tr. at 18). Claimant argues that his January 2009 IEP established his marked difficulties in comprehending what he heard and read and further substantiated that he only achieved passing grades when he was held to a lower standard than other students his age who did not have impairments.

In the written decision, the ALJ explained that the domain of acquiring and using information involves a child's ability to perceive, think about, remember and use information in all settings. While acknowledging that Claimant had obvious problems comprehending oral instructions and reading and comprehending written materials, the ALJ noted that Claimant's full-scale IQ score was 79; his grades and performance at school were improved; and he was able to recall and understand directions when examined by an agency consultant. (*Id.*). In addition, the ALJ relied upon a focused assessment completed by one of Claimant's teachers, Ms. Susan Hamilton, who had known Claimant for over three years and had daily contact with

him at school during the lunch break and for reading and writing. In the assessment, Ms. Hamilton examined Claimant's ability to acquire and use information and compared it to other same-aged children at school who had no disability, rating Claimant's functioning on a scale of one to five, with one signifying "no problem" and five signifying a "very serious problem." (Tr. at 97-98). She rated Claimant as a 3 on nearly all ten activities within the domain, confirming that Claimant had an "obvious problem" with the activities, but not a "serious" or "very serious" problem. (Tr. at 98). Ms. Hamilton added that Claimant had "to continually be coaxed back on task" and his activities in this domain were inhibited due to his "inattentiveness." (*Id.*). The ALJ found Ms. Hamilton's evaluation to be consistent with that of Claimant's other teachers, who "endorsed that the claimant remain in the general education environment 100% of the time." (Tr. at 17). Although the ALJ identified some limitations in Claimant's ability to acquire and use information, the ALJ determined that the evidence of record was harmonious and uniformly indicated that these limitations were not marked.

Having scrutinized the evidence as a whole, the Court finds Claimant's challenge to the ALJ's severity rating to be unpersuasive. Substantial evidence exists that Claimant's difficulties with acquiring and using information were not of sufficient magnitude to constitute a "marked" limitation. Claimant underwent intelligence testing on several occasions. At age eight, Claimant's verbal IQ was 72; his performance IQ was 80; and his full scale IQ was 74. (Tr. at 218-19). Based upon these scores, Claimant was referred to the IEP eligibility committee at his school for consideration of special education services. (Tr. at 228). At that time, Claimant was enrolled in the first grade. On January 22, 2009, the IEP committee members

reviewed Claimant's present level of academic achievement and functional performance, noting that his test scores in reading/language arts, math and science all fell within a first grade performance level. (Tr. at 157). They also found that Claimant could recite and identify words used in the Saxton Phonetics Program and could comprehend a story and answer questions when he was listening. He had difficulties with reading and spelling, but was able to make passing grades in mathematics without accommodation. (Tr. at 157-58). The committee concluded that Claimant did not meet criteria to qualify for special education and could remain in the general education environment 100% of the time. (Tr. at 162, 165). To address Claimant's deficiencies, the committee suggested some minor modifications to his lesson plan, including reducing his weekly vocabulary review to twelve words rather than fifteen and allowing him some extra time to complete timed tests. (Tr. at 157-58).

On March 31, 2009, agency consultant, Lisa Tate, M.A., completed a comprehensive psychological evaluation of Claimant. (Tr. at 281-86). Ms. Tate obtained Claimant's medical history from his mother, who stated that Claimant had a history of seizures and binocular fusional dysfunction, but did not currently take any medications. He had no recent illnesses, injuries, or hospitalizations. Claimant's mother described Claimant's daily activities, indicating that he attended the second grade and liked school. He was independent in his grooming and hygiene and loved to clean and help with the dishes, dusting, and sweeping at home. Claimant's mother stated that Claimant liked to play outdoors, play with his Nintendo DS, and watch television. He had friends at school and also had a good relationship with his three younger siblings. (Tr. at 283). Ms. Tate performed a mental status

examination that revealed essentially normal findings, although Claimant's judgment was mildly deficient and his recent memory was moderately deficient. Ms. Tate administered an intelligence test and found Claimant to have a full-scale IQ score of 79. (Tr. at 284). She observed that Claimant recalled and understood directions; worked at a normal pace, and was persistent, requiring little encouragement. On mathematics, reading, and spelling subtests, Claimant had a composite score of 84. Ms. Tate diagnosed Claimant with Anxiety Disorder, not otherwise specified, (provisional), based upon historical information and with borderline intellectual functioning based upon his IQ scores. (Tr. at 285).

After reviewing Claimant's medical records and the test results provided by Ms. Tate, Cindy Osborne, D.O. and Bob Marinelli, Ed.D. completed a Childhood Disability Evaluation Form on April 7, 2009. (Tr. at 287-293). They concluded that Claimant had an impairment or combination of impairments that was severe, but did not meet, medically equal, or functionally equal the Listing. Under the domain evaluations, the consultants found that Claimant had less than marked limitations in acquiring and using information. (Tr. at 289). They commented that Claimant's teacher had observed "obvious" problems in this domain, but did not feel that the problems were serious or very serious. They also noted that Claimant had eyesight difficulties and attention deficit disorder that affected his learning process, the former condition of which was being treated. A second Childhood Disability Evaluation Form was completed by Uma Reddy, M.D. and Jeff Harlow, Ph.D., on June 22, 2009. (Tr. at 322-328). Drs. Reddy and Harlow also opined that Claimant had an impairment or combination of impairments that was severe, but did not meet, medically equal, or functionally equal the Listing. They reviewed Claimant's

IQ scores and his results on aptitude tests measuring skill in mathematics, reading and spelling and agreed that he had less than marked limitations in acquiring and using information. (Tr. at 324).

Records from Claimant's pediatrician indicate that treatment was initiated for Claimant's ADHD and he was doing well on medication. (Tr. at 345). On October 9, 2009, Claimant's mother reported that Claimant was still not focusing, although his grades had improved. On April 13, 2010, Claimant underwent an EEG to determine if any of his difficulties were related to ongoing seizure disorder, and the EEG was normal. (Tr. at 361). The attending neurologist felt Claimant had some behavioral problems and would benefit from psychiatric care. (*Id.*).

The functional assessments completed by Ms. Hamilton and Drs. Osborne, Marinelli, Reddy, and Harlow were entirely in agreement that Claimant's ability to acquire and use information was impaired, but was not markedly so. Moreover, the IEP eligibility committee did not find Claimant's performance at school to be sufficiently delayed to merit special education services. Like most nine-year-old children, Claimant could perform simple household chores and take care of his own grooming; enjoyed playing outside and with his Nintendo DS; and could comprehend instructions and classroom lessons when he paid attention. Accordingly, substantial evidence exists to support the ALJ's determination that Claimant had a less than marked limitation in his ability to acquire and use information.

### B. Appeal Council's Consideration of Additional Evidence

Claimant next argues that the Appeals Council failed to appreciate the importance of a second IEP prepared by the school's eligibility committee on April

27, 2010 and submitted to the Appeals Council prior to its denial of Claimant's request for review. (Docket No. 11 at 13). In particular, Claimant highlights the concerns raised in the IEP that he had intermittent toileting accidents[4] at school and failed to respond appropriately to them. According to Claimant, the combination of his toileting difficulties, academic and cognitive impairments, recent positive screening test for Asperger's syndrome,[5] and behavioral problems irrefutably establish functional equivalence to the Listing.

The analytical process for determining functional equivalency is well-established and rests on the making of severity ratings within accepted domains of functioning. Here, Claimant fails to establish that his April 2010 IEP alters the severity ratings made by the ALJ in any of the six domains. The 2010 IEP committee

---

[4] The IEP revealed that on four occasions during the previous school year, Claimant had defecated on himself without notifying anyone that he needed to use the restroom or needed to call home for a change of clothing. The IEP committee declined to address this matter as a behavioral problem until Claimant's parents had an opportunity to explore a medical basis for the incidents. (Tr. at 194). Prior to development of the IEP, this problem was reported to Claimant's psychologist, who provided Claimant with an intervention plan to prevent encopresis. Encopresis is a condition in which a child, usually over the age of 4, will resist having a bowel movement, often resulting in leakage of liquid stool onto the child's clothing. The primary cause of encopresis is chronic constipation, which can be addressed by increasing fiber intake, increasing fluids, and decreasing the intake of dairy products. Less frequently, emotional stress may trigger encopresis. © 1998-2012 Mayo Foundation for Medical Education and Research. On October 9, 2009, the psychologist concluded that the plan was working as Claimant was experiencing significantly fewer accidents. (Tr. at 347).

[5] Asperger syndrome (AS) is a developmental disorder that is characterized by limited interests or an unusual preoccupation with a particular subject to the exclusion of other activities and:

- repetitive routines or rituals
- peculiarities in speech and language, such as speaking in an overly formal manner or in a monotone, or taking figures of speech literally
- socially and emotionally inappropriate behavior and the inability to interact successfully with peers
- problems with non-verbal communication, including the restricted use of gestures, limited or inappropriate facial expressions, or a peculiar, stiff gaze
- clumsy and uncoordinated motor movements.

© National Institute of Neurological Disorders and Stroke, January 2012.

noted that Claimant was progressing to the fourth grade with his peers. (Tr. at 194). Claimant's weakness in reading and language arts was due to his slow processing time; however, he enjoyed reading and frequently volunteered to read aloud in class. The committee decided that continued modification of assignments and grading would be necessary "in order to be successful in the 4th grade," implicitly confirming the committee's belief that Claimant could, with some assistance, master the skills required of the average fourth grade student. (*Id.*). In addition, to help Claimant retain oral reading fluency, the committee authorized one month of direct assistance to Claimant over the summer break. (Tr. at 195). Although Claimant had not been successful in writing compositions and did not accurately use punctuation, he was verbally able to create a topic sentence and give supporting details. (Tr. at 194). Consequently, the committee recommended continued modifications to help Claimant improve his writing skills. In regard to mathematics, Claimant was able to follow the general curriculum, needing only minimal encouragement to stay focused and pay attention to the task. The committee did not require additional testing of Claimant. Moreover, the IEP indicated that Claimant had improved in reading and language arts and exceeded the benchmark in mathematics on his most recent acuity assessment. (Tr. at 196). The only critical annual goal identified for Claimant was to increase his oral reading fluency from 40 words per minute to 50-60 words per minute. (Tr. at 197). The plan was to provide Claimant with co-teaching services 5 hours per school week and re-teaching services 2 ½ hours each week. (Tr. at 199). Claimant was designated as a full-time student in the general education curriculum. The committee recommended that 92.5% of his time be spent without services and only 7.5% of his time be spent in special education. (Tr. at 200). While the IEP

reconfirmed the ALJ's conclusion that Claimant had a marked limitation in his ability to attend to and complete tasks and some additional limitation in his ability to acquire and use information, it was not significantly different from the prior IEP. Accordingly, the Court simply cannot conclude on the basis of the April 2010 IEP that the ALJ's decision was not supported by substantial evidence. Similarly, Claimant's toileting issues do not supply a sufficient basis for remand. As the Commissioner points out, Claimant's episodes of encopresis were intermittent and were not recognized as having a major functional impact on his daily activities. Claimant was being evaluated for the underlying cause of the problem and was receiving concurrent psychological support. (Tr. at 347). Considering the record as a whole, the Court finds that the Appeals Council gave sufficient weight to the new evidence submitted by Claimant.

## VII. Conclusion

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:** February 14, 2012.

_____
Cheryl A. Eifert
United States Magistrate Judge